May it please the Court, good morning, Your Honors. I'm Petter Batalden and I'm appearing on behalf of Taser International in these consolidated appeals. This is a products liability action and the main issue that divided the parties at trial was the element of causation. Specifically, whether multiple deployments of Taser devices by police officers were capable of causing acidosis leading to the cardiac arrest and death of Robert Heston. Because causation was the central issue at trial, it was acutely prejudicial when the district court allowed the plaintiff's causation experts to testify, although they were unqualified to do so under Rule 702 and Daubert. And by the same token, it was acutely prejudicial when the district court instructed the jury on causation in a manner that eliminated the substantial factor of language required by California courts. And for these reasons, we ask the Court to reverse the judgment and order a new trial. If in fact we were to agree with you that there were prejudicial instructional errors relating to the causation, would we need to address the other issues? No, Your Honor. At that point, the order of a new trial would obviate the need to consider both the attorney fees award, which would fall with the judgment, as well as all of the issues raised by the cross-appeal that the plaintiffs had brought. I'd like to start with the Daubert error, if I may. This Court's review is for abuse of discretion, and under the Embank decision in Hinkson, there are two steps to that review, and Taser ought to prevail under both steps. Here, the district court failed to identify and apply the correct legal standard. Instead of investigating, as Daubert requires, whether the plaintiff's experts engaged in good science and an examination of the methodologies and reasoning that those experts employed, the Court said, I don't know how tasers work. I don't understand it. And if there's any basis for them to testify, even a weak one, I have to allow them to testify. That certainly is an awkward statement, if not a plainly wrong one. But, you know, let's face it here. We're talking about the qualification of a cardiologist, internal medicine, a subspecialty, and some electrical, something or other that I can't remember. Electrophysiology. Thank you. And we're talking about a medical examiner, both of whom had exemplary credentials in their respective areas. So we're not talking about some exotic science, including we're not talking about whether there was a malfunction in the taser or anything like that that requires expertise in tasers as such. We're talking about doctors looking at a body and making a judgment about what caused death. So why is it that the district court has to go through a more elaborate, more varied examination than it did? Because in this instance, Your Honor, the plaintiff's experts candidly admitted, they conceded, in other words, that they didn't have expertise in the key areas of causation implicated by this case. Not only did they not have experience or training or understanding of the taser devices, they conceded they didn't understand how those devices operated on the human body. And in the case of Dr. Haddix in particular, she said she didn't have expertise in metabolic acidosis. Well, that's the very pathway the plaintiff, say, caused Heston's injury. That's the whole case. If the plaintiff's experts are admitting they lack expertise in those areas, then there's no possible proof of causation that the plaintiff's can make. You lose. Your Honor, we believe- Cross-examination is a wonderful antiseptic when a judge lets in testimony. I mean, I agree with Judge Ryan. You look at their qualifications. You look at the fact that they relied on peer-reviewed standards. As a trial judge, I'm pretty sure I'd have let them testify, and I would have looked to the lawyers to cross-examine them and convince a jury that your experts knew more than their experts. And that's ultimately the function for a jury and one that they are uniquely equipped to handle. Your Honor, Daubert stands as a bulwark against the idea that submitting the issue of expert qualifications to the jury is an antiseptic. We have the Daubert rule precisely because we don't want juries to be considering scientific evidence that is not good science. That's the whole purpose of the test, is to keep from the jury scientific evidence that's not trustworthy. And when you have experts who say, I don't understand how tasers work or how they affect the body, Dr. Myers admitted, this is at page 444 of the excerpts of record, he made an error in his calculations because he didn't understand how the taser device worked and the pulses that it gave off. When you have fundamental errors like that going to the central issue at trial, you have to reverse. They understood that tasers work using electrical shock. They had studies on pigs where shocks caused acidosis. They had the expertise in terms of what acidosis does to the human body. I mean, why isn't that a sufficient constellation of facts that they have studied, that they understand, that they know, to entitle them to testify in this subject matter? I'm glad Your Honor brought up the studies because I think the failure in terms of knowledge and training with tasers and their effects on the body shows that these experts' opinions were no better than the studies they relied on. And the studies are not materially similar to the case and the facts of this case. Here we have studies that do not show clinically significant increases in blood acidity. Well, that's the whole case. If those studies don't support the ultimate conclusion of these experts that multiple deployments of taser devices can raise blood acidity to the level that it causes cardiac arrest, the plaintiffs can't win. They have no case. So for those reasons, the experts ought to have been disqualified. I'd like to discuss briefly instructional error. And I want to hone in on one point in particular, and that's the absence of substantial factor language. Your Honor, I think the procedural question of preserving the objection is a little trickier than that. The — if you look at page 143 of the excerpts of record, there is a written objection   than that. I realize that both parties wanted the court to give, what is it, 1222 straight up, which the district court didn't do. It monkeyed with it. And so I understand that you preserved a wish that that had happened, but there's no objection to the handling of the case.   And the district court did not have the ability to make an objection to the handcrafted instruction that was given. That's correct, Your Honor. So why doesn't it just flat-out waive it? That objection has to be on the record under the rules and under our law. Well, there are two reasons, Your Honor. First, in part, the district court impeded the ability of counsel to make an objection. The rule contemplates that. It says, you know, if you didn't have time or if you couldn't do it or whatever, do it after the instructions. Just do it. It's very easy, as you say, to put in a written objection. Just plunk it to the clerk and say, you know, I object to that. The truth of the matter, Your Honor, is that it's difficult to imagine an objection would have made any difference. I think we come within the futility exception here. Come on. I mean, that's the whole reason for it. I realize it wasn't you, so you're just the messenger here. But that's the whole reason why objections should be lodged. Because I can make an argument that there is no infirmity in that instruction at all. In total, the one that was given. If you conclude element 6 and 7, even though it's not a model of clarity, I can make an argument that there's nothing wrong with it. Or I can make an argument that there's something fundamentally wrong with it. I can argue both ways. But that's the reason for giving the district judge a shot at correcting his own error. The last thing I'd want to say about that in response to your question, Your Honor, is that the omission of substantial factor language, which the California Supreme Court has said is tantamount to magic language, is a plain error. But it's in there. It's just ambiguous, arguably. Your Honor, it doesn't appear in the seventh element, which is the element that the plaintiffs contend connects the multiple deployments to the cause of the acidosis. That language is lacking. But it hinges on it. I don't know that we need to get into this too much, because at least I think you waived it. If you haven't waived it, maybe other people have got a question. I'll move to attorney fees, Your Honor. But let me just parenthetically, or as a footnote, let me just mention there's one error in our yellow brief addressing the instructional error point. On the paragraph that carries over from page three to four, we make a representation that the verdict form didn't include a question linking the multiple deployments to acidosis. And, in fact, there is such a question on the verdict form. It doesn't obviate or alter our argument about substantial factor language, but it did want to correct that. In terms of attorney's fees, if the court gets to that issue, it should reverse the award, because there has never been a products liability action involving individual plaintiffs in which California courts have permitted fees to be recovered under the private attorney general statute. And that stands to reason. In a case like this, the Hestons brought their action to recover compensation for the death of their son and brother. They didn't bring this action to vindicate the public interest or broader goals of public safety. And the California Supreme Court has made very clear that only public interest litigation in the conventional sense qualifies for application of the fee shifting statute. We don't have that here. We have none of the traditional hallmarks or indicia of public interest litigation. Is there a review for abusive discretion or is it something else? Your Honor, I think it's a thorny question to answer. The court has held that the abuse has in a prior case applied the abusive discretion standard in reviewing a fees award under section 1021.5. But by the same token, the court has said time and again that where you're considering whether a statute applies, it's a legal question, and that's review de novo. So I think the way to square those two is through the first step of the Hinkson analysis, where you have a legal question about whether the correct legal rule is applied. And under that framework, you have what amounts to a legal question. Ought this statute to apply in this type of case? And we say no, because the California Supreme Court has said only where public interest litigation in the conventional sense of that term is involved does this statute apply. Taser is not a governmental actor. We don't have any claims about statutory, regulatory, constitutional violations. We have plaintiff's attorneys who are willing to take the case on a contingent fee basis. I'm not saying that any one of these in isolation is disqualifying, but the fact that none of the traditional indicia of public interest litigation is present here is fatal to the claim that this statute applies. Now, if you get past that point, at minimum, you have to reverse the fees award because the district court gave no explanation for why it awarded the full amount. And that's an obvious and automatic error under this Court's precedence. The Court has to explain its reasoning. Otherwise, this Court can't review it. There's no indication that there was any exercise of discretion on the district court's part in awarding the full sum that the plaintiff's requested. So that's a reversible error. Let me touch briefly on the cross appeal and the punitive damages issues, which, again, the Court doesn't need to address those if it accepts the Daubert error argument. Our position on the cross appeal is that it's beyond the jurisdiction of this Court to consider because the only appealable order presenting the punitive damages issues was the October 2008 order that vacated the jury's award of punitive damages. And the plaintiffs didn't appeal within 30 days of that order, as Rule 4 requires. To the extent the plaintiffs say that they can appeal that order from the judgment and I'm not sure it's clear from the notice of appeal that they really have appealed from the judgment. They speak mainly of the order in that notice of appeal. But to the extent that they're trying to appeal from the judgment, they can't because they're not aggrieved by the judgment. They won the judgment. It's in their favor. That's true. And to the extent they lost it, their beef is with the order that vacated those punitive damages, and that's the October 2008 order. The judgment didn't take the punitive damages away from them. It simply reflected the result of the earlier order. So this Court doesn't have jurisdiction over the cross appeal. Even if you believe that the Court does have jurisdiction over the cross appeal, you still have a situation where the district court got it right in vacating the punitive damages awards. The $5 million awards to the parents was properly vacated because they're not entitled to recover punitive damages under California's statutory scheme. And moreover, those parents haven't appealed. They're not before the Court. The only plaintiff that's before this Court is the estate's representative, Misty Kastner. The $200,000 award that Kastner received was likewise properly vacated because she submitted no evidence of compensatory damages. And without the basis for a compensatory damages award, there can't be any punitive damages. That's what this Court has explained in California v. Altus Financial. So for all of those reasons, we would ask the Court either to dismiss the cross appeal or affirm the aspects implicated by that cross appeal. And on the main appeal, we would ask the Court to reverse the judgment and order a new trial. Unless there are further questions, I'll save my time for rebuttal. Thank you. Thank you. Mr. Burton. Good morning, Your Honors. I would like to first, and I'm reluctant to do this, but Peter Williamson, who's at counsel table, and I tried this case, and counsel just made two very serious misrepresentations of the record. I think probably the most serious one was when he said that the peer-reviewed studies on acidosis in swine did not reveal any clinically significant raise in blood acid. And, in fact, that's absolutely false. The testimony is cited in our brief. It's contained in the record. What Dr. Myers, who is a cardiac electrophysiologist affiliated with UCLA and is an excellent published doctor, and he's the only cardiologist who testified in this case, which had to do with what caused a cardiac arrest, said was that he put on the peer-reviewed studies, and they're in the record, that were performed first by a doctor, it's pronounced Yoshum, it's J-A-U-C-H-E-M, for the United States Air Force, which was evaluating this technology for use by the Department of Defense. And he tased his pigs with 18 cycles. Mr. Heston received 25 cycles. Those pigs had a pH change that put them in a high danger zone for cardiac arrest, and that's what he testified to. There were graphics that were put in front of the jury that showed this very, very dangerous level of blood acid induced directly by the muscle contractions that were caused by the taser device. Those findings were replicated in a second independent study that also used pigs by a doctor named Andrew Dennis and a number of other researchers at peer-reviewed issued. This study was done after the Heston incident, but before the trial, and he relied on it. And it showed in two 40-second applications, which still was less electricity than Mr. Heston received during this incident, severe metabolic acidosis in the swine, and in fact two of them had cardiac arrest during the experiment. There is a study on human beings that is also in the record that Dr. Myers relied on that was performed by a doctor in San Diego named Dr. Vilk and a number of colleagues. It's also peer-reviewed. They subjected human volunteers to five-second cycles. Those five-second cycles did affect the blood acid of the volunteers, but not in a clinically significant way. That is where I imagine this incorrect statement came from. Interestingly, Dr. Yoshim also measured five-second cycles in pigs and got exactly the same change in blood acid as did Dr. Vilk on human beings, showing that in this area the interspecies extrapolation of the data is entirely valid. This was all laid out to the jury. There was lots of opportunity for cross-examination. Also on this point that supposedly Dr. Myers and Dr. Haddox conceded they had no expertise in the most important issues in the case, that's absolutely false. What they conceded was that they had not previously personally done experiments with taser electrical control devices and therefore relied on the public literature. And all this was laid out to the court during what was, in fact, a very extensive Daubert pretrial hearing. And then again during trial. And the jury understood it. The judge understood it. And it led to this verdict, which we ask that the court affirm in all its particulars, including the full $5.2 million in punitive damages. These two issues are related. The evidence in the case was that there was a real dearth of data on this new product. This product was put on the market around 2000. Much, much, much more powerful electrically than preceding electrical control devices that had been around since the 1970s. The first peer-reviewed study, which did not deal with acidosis, didn't come out until January of 2005, the month before this incident. However, this independent information from Dr. Yoshim in the Air Force had been provided to Taser International in November of 2004, showing this dangerous level of acidosis. The jury heard this testimony from Rick Smith, who is the CEO of Taser International. Taser put out kind of a weak warning about that. That warning is in the record. However, that warning appeared as slide number 108 in a 174-slide PowerPoint presentation on the new training, which was version 12, which was issued in November or December of 2004, a couple months before this incident. That was their response to this information from Dr. Yoshim. The officers who did the tasing and the officer, Sergeant Mike Groves, who trained them, said, we didn't know this could happen. We're as surprised as anybody that this man went into cardiac arrest and died in his parents' living room after we were called to come to the house to help. Sergeant Groves said, we never got this. I mean, question whatever it was, 16? No, I disagree, Your Honor. They were talking there about when the first, I think they were addressing, is there a defect in the product, or is there negligence in the way that Taser provided instruction on using the product? Yeah, did you know the problem? I'm sorry? Not an exact wording of it, but that's the way it was. Did you realize there was a problem? When you sold the device to Salinas. However, after they sold the device to Salinas, they received the information from Dr. Yoshim of the serious acidosis, and then they did not notify their purchasers about the risk of acidosis. And under California law ---- I guess my point is, you're making a fine closing argument to the jury. The jury resolved that adversely to you in question 16, which the district court said. But they were ---- You're making a punitive damages pitch, and maybe I'm misunderstanding what pitch you're making right now. Let me switch to the punitive damage evidence. Because I think it needs to be read in connection with the answers to question 12 and 13. Well, you know, 13 is just simply a reasonable person standard. For punitive damages, it has to be what Taser knew and did. Right. What a reasonable person would or wouldn't have done just doesn't have any bearing on ---- And what the instructions ---- And not only that, but as I understand it, the conduct has to be willful, wanton, conscious disregard under the law. And if the court refers to the ---- And therefore, that's why the court went where it did. The ---- I respectfully disagree, Judge Smith. I mean, I agree with what the law is. I disagree with whether that happened in this case. There are the jury instructions in the record. And the jury was specifically instructed accurately on California punitive damage liability and what the standard is. And if you give me just one moment ---- What was the instruction that you think best approximates that? If I could just have one second, Your Honor. I'm having a little trouble because your time is running. And so I've ---- Well, I've got ten minutes. I've got a couple other questions, too. Well, can you see me find it, Your Honor? Well, assuming that the instruction was the normal California punitive damage instruction. It's cited. It's exactly the California ---- It says it has to be willful, wanton, reckless disregard for the consequences. It was ---- They were instructed that the standard was clear and convincing evidence, not preponderance. They had to show a reckless disregard for life, safety. All that language was given to the jury in an instruction. Okay. Let me change the view just a little bit. We're talking about the first instructions that prove the causation. And as I read the record, there is nothing in the record to suggest that Taser ever objected to the instruction. However, as I understand the argument, there was an objection during an instructional conference. And I didn't see anything in the record that you suggested that did not occur. That did not happen. The number one, there is nothing wrong with the instruction. As Judge Reimer said, what the ---- So your whole argument is there's nothing wrong with the instruction. But is your argument further, even if there is something wrong with it, they have waived it? Absolutely. And it's because you are suggesting, and I guess I didn't read the briefs very well, because I didn't ever see anything in there that you denied that they objected during the instructional conference. Was I supposed to become a declarant in the opposing brief? No, no. I was just trying to see if there was ---- Your Honor, here's what happened. Number one, in their opening brief, they cite paragraph number six and say paragraph number seven got left out. In our responding brief, we said you're not quoting the whole instruction. Here's paragraph number seven. Here are the elements of causation that you say were admitted. And they were in the next paragraph, and they were omitted from the opening brief in what I consider to be a more serious error of appellate advocacy. Then, if you look in their reply brief, they said, well, the jury never reached that. But question number 18, do you find that as a consequence of the prolonged deployment prior to his death, Robert Heston suffered acidosis to a degree which caused him to have a cardiac arrest? Answer, yes. Question number 19, did the parents suffer harm because as a consequence of the cardiac arrest, Robert Heston died? Answer, yes. So it's both in the instructions, and it's broken down as answers in the general verdict form. Secondly, there was no objection made that the jury was not being adequately instructed on causation under California products law. Taser made, and this was remarked on several times by the district court, Taser made omnibus objections to the whole, you know, the fact they were being sued and to all the instructions. But they never specifically said this instruction needs to be fixed. And under California law, an omnibus instruction is not a valid instruction or a valid objection to this instruction. Well, absolutely. That would completely destroy the rule. Then, you know, every person who's before you go to the jury, you just tell the judge, I object to every instruction. This, there's nothing wrong with the instruction. There was no objection made. And then there was a very extensive round of post-trial litigation, new trial motions, judgments for, motions for judgment as a matter of law. And in all of those, there was not one mention of this problem. The first time it was raised as an issue was in the opening brief. It was the first time I saw it. Then we responded, well, you're only quoting paragraph 6, not paragraph 7, which has the express language that you say is missing from paragraph 6, which, of course, it is because there's paragraph 7. And I think if the court refers to the instructions, you'll see. Well, if I read paragraph 7, they don't have to find both of the necessary consequences. You can find either one or both. You can either find that prior to the death, he suffered acidosis to a degree to cause him to have a cardiac arrest and or B. Separately, Betty's plaintiffs, Betty Lou Heston and Robert Heston, the parents of Robert Heston suffered harm because as a consequence of the arrest. So under that, what says in 7, it says you can either find one or both. So I have a tough time figuring out how they would have been absolutely suggesting that we had to find both, which is the only way is the only one which really goes where you want to go. Your Honor, number one, that argument was first raised by Taser in that reply brief. That's the first time we ever saw that. Number two, questions number 18 and 19, the answers to which counsel admits he misrepresented in the reply brief, specifically show that the jury made both of those two findings. So they found specifically under 18, yes, he had acidosis which caused the cardiac arrest, and yes, the parents suffered harm. If you read that carefully, and I agree with Judge Reimer that it perhaps could have been more clear, but Judge Ware was trying to make sure that the jury had all the options in front of it. You cannot actually answer the second part of that about whether the parents suffered harm, yes, without also answering the first part, yes, because the second part refers to the fact that they suffered harm because as a consequence of the cardiac arrest, Robert Heston died. And the first part of the question said, did he suffer a cardiac arrest because of the acidosis? So the two absolutely link together, and I think what Judge Ware was saying to the jury, well, just because you found that the acidosis caused a heart attack or the cardiac arrest, which caused him to die, doesn't mean that you have to find that the parents suffered harm as a result. You have to make that additional finding. That's what he was clearly saying there. Can I ask a question about the 1021.5 attorney fee? Yes. I've looked at, in Ray, the adoption of Joshua S., and what about this case qualifies under the statute indicating the necessity for pursuing the lawsuit placed a burden on the plaintiff out of proportion to his individual stake in the matter? What additional burden? Thank you, Your Honor. I think all these points were addressed very thoroughly by the district court when he explained the basis for exercising his discretion to award the fees. And what is different here is that the Taser product is different than, I think, any other product in this sense. This device is manufactured. It's not government regulated by any entity whatsoever. Privately manufactured, sold directly to police agencies like Salinas. And the standards for its use and the training for officers for its use is provided by the manufacturer. And that's where the problem arose in this case. So the fact that this is not a regulated product from your perspective that gives rise to these fees? Because you don't get these fees in the E. coli coming out of Salinas. You don't get these kind of fees in an air crash case where you demonstrate that there's a persistent problem with the elevator or some other system in the aircraft. Every product liability results in some public benefit. But the products are not being given to police officers with training that then gives the police officers a false sense that the product is not lethal when cycled repeatedly, when, in fact, it is lethal. I would say the public interest here goes well beyond the individual victim. It's not whether the public has benefited. It's whether or not you're pursuing the lawsuit placed a burden on you, on the plaintiff, that was out of proportion to the individual's stake in the matter. And Judge Ware went through that analysis expressly and found that going into the lawsuit with the degree of success, with the problems regarding damages that were presented by our client, that, in fact, prospectively, pursuing the claim against Taser did not justify the amount of time, effort, and work that was put into it, but that there was a public benefit. I mean, this verdict wound up being commented upon in a New York Times editorial within a week. It had huge ramifications through the use of the device. And today, as reflected in footnote 6 of our opening brief, Taser expressly warns about repeated applications of the device causing acidosis, particularly in somebody who is in a distressed state, as was Mr. Heston. One of the things that Judge Ware said about the public benefit was this will cause Taser to change its training, and, in fact, that has happened. And all over, because I'm quite involved in Taser litigation, this verdict has caused departments to look at their policies, especially regarding acidosis and extended tasings, to modify their training, to limit the use, and has had an impact on saving lives in the public and also has had an impact on police officers. I can't imagine anything worse than these police officers being called out to the Heston home to help with a difficult situation, and rather than helping their son, who was obviously having this medical emergency, leaving knowing that they had killed him because Taser had concealed from them this information that the jury heard over three weeks and had analyzed from every angle, that when you cycle this thing over and over again, when you hold down the trigger, that it builds up this blood acid and stops the heart. And these officers have to live with that. And the jury heard this. And I think the reason the jury exonerated the officers and slammed Taser was precisely that, that whether or not there was excessive force in the amount of time they used the Taser, they had no idea that they were dealing with a potentially lethal product. And that was because they were not told about this very real risk that the CEO of Taser, Rick Smith. Your time has long since expired. Oh, I thought I had a minute. It's going the other direction. Thank you for your argument. Thank you very much. And I misread the clock, Your Honor. Thank you. Thank you. Let me begin by responding on the instructional error point, if I may. If the court looks at page 143 of the excerpts of record, it states that Taser objects to the closing jury instructions, failure to include the following jury instructions. And then it lists KC 430, causation substantial factor, and KC 1221, negligence, basic standard of care. That's a written objection. It's prior to the instruction conference. That's true. But it suggests that the district court had already decided by this point that it was not going to give the substantial factor language. That is the reason that the Federal rule says the objection has to be, quote, on the record, end of quote. We can't be left to guess what happened in an unreported instruction conference. Your Honor, I can't write a million cases, and the instruction conferences are seldom on the record, because you can't work through them. But, boy, are the objections clearly put on the record, if there are any. Your Honor, I don't disagree with what you said. But I think what this statement reveals is that prior to the instruction conference, it was already clear the district court wasn't giving substantial factor language in the way Taser wanted. I think it didn't give substantial factor language. It's just that you don't think it was accurate enough or clear enough to cover your point. Let me take one step back. The way that the district court crafted this instruction broke the causation inquiry into two steps. First, what did the warning lead the police officers to do? And then second, did the deployment lead to multiple deployments of the Taser devices lead to acidosis? The instruction contains substantial factor language on the first part of that. That's element six. It doesn't contain substantial factor language on the second part of it. But California law says substantial factor applies to the entire causation inquiry, not just one part or another part, the whole causal link in the chain. That's what the Cayce model instructions require. That's what both parties asked. As a result of the or as a consequence of the prolong. I mean, I talk about district judge here, heat of the moment, trying to get the jury instructed. How are you, how is the district judge going to know what you're talking about? It's a very refined argument that you're now making, that you are now making. Well, I'd offer two responses here, Your Honor. First, the as a consequence language is precisely the heart of the problem. Because that allows the jury to determine that if there's any relationship between these two events, multiple deployments and acidosis, no matter how remote, how attenuated, they can hold Taser liable. And that's not California law. California law requires more. And second, this is not really a nuanced or esoteric point. The California Supreme Court has made absolutely clear that substantial factor language has to be included. It's almost magic language from a California law perspective. And it's missing here. Let me deal briefly with the Daubert issue. Dr. Myers acknowledged, and I believe I heard Mr. Burton say this, that a number of the studies he relied on didn't involve clinically significant changes in blood acid level. Now, what Mr. Burton wants to say is, everything can rest on the Yalcum study, which I find a remarkable statement because the Yalcum study author, Dr. Yalcum, expressly cautioned scientists not to draw the inference from his work that multiple deployments can cause acidosis in the field when officers do so. There's an express repudiation by the study author of the inference that Dr. Myers wanted to draw. Now, if the district court in this case had actually engaged in the Daubert gatekeeping application test, rather than simply assuming that this was going to be good enough and we'll let the jury decide, the court would have picked up on that and would have excluded that expert testimony. That's why it's an abuse of discretion. And finally, on attorney's fees, I'd like to make one point in response to the line of inquiry from Judge Layton with Mr. Burton. I think there's a strong argument to be made here that the result of this case not only does not redound to the public benefit, it actually is likely to be detrimental to the public. If the result of this sort of judgment means that now police departments or TASER are going to have to give warnings prescribing multiple deployments of I don't think the magnitude of the public benefit is the issue. The issue is whether or not the burden borne by the plaintiff in taking this case justifies it. And I think what's telling is Mr. Burton says I'm involved in a lot of these cases. Well, if I'm involved in these, that's an economic decision that Mr. Burton is making. That's absolutely right, Your Honor. And that suggests that perhaps fees are inappropriate, because the burden is no greater than what you would assume when you take on these kinds of cases in any event. There are lots of cases where litigation results and redounds to the public benefit immensely, immensely, but they're not all subject to public, public policy fees. Thank you, Your Honor. Thank you, counsel. Both of you. The matter, historically, will be submitted in the court list in recess for the day. All rise.
judges: Leighton, Rymer, Smith N. R.